## ALEXANDER RUSSELL et ux. v. MICHAEL SHARP et al., Appellants.

### Division One, December 21, 1905.

1. **SPECIFIC PERFORMANCE: Oral Contract: Statute of Frauds.** An oral contract by which the owner of land agreed with a niece and her husband that, if they would move on his land and take care of him when he was sick and as long as he lived, they were at his death to have all his property, including land, is within the scope of the Statute of Frauds. Such a contract will not be recognized in law unless it is in writing and signed by the party sought to be charged.

2. ————: ————: ————: **Wisdom of Statute.** To allow an estate to be diverted from the statutory course of descent by oral evidence of an oral contract alleged to have been made more than thirty years before the death of the party whose estate is sought to be charged and whose lips are therefore sealed, would be not only a constant menace to the peace of families, but a constant temptation to the commission of fraud and perjury.

3. ————: ————: ————: **Exception.** But, however wise and just in its general application a law may be, it is not of such inflexible character, in equity, that it will always be applied regardless of circumstances. Where its application would result in the perpetration of a fraud, equity will interpose to prevent the Statute of Frauds from being made the instrument of that fraud. But in so doing, a court of equity does not brush aside the statute or impugn its wisdom; on the contrary, it adds a new strength to it by so administering it as to demonstrate that the evil which it was designed to prevent is not promoted by an application of that statute.

4. ————: ————: ————: ————: **How Wisdom of Exception Demonstrated.** A court of equity demonstrates this exception to the application of the Statute of Frauds by requiring one who invokes the aid of equity to prove his case by evidence so unquestionable in its character, so clear, cogent and convincing, that no reasonable doubt can be entertained of its truth— that no such doubt can linger either as to the existence of the contract or the certainty of its terms or that the plaintiff has wholly performed his part of it.

Russell v. Sharp.

5. ———: ———: **Amending Petition.** According to the petition as filed, plaintiffs were to move upon decedent's farm, there reside, help improve it and remain there aiding him as long as he should live, and for that, at his death, they were to have all his property. After the evidence closed the court permitted them to amend their petition by striking out the words, "help improve it and remain there aiding him," and by inserting in lieu thereof the words, "take care of him when he was sick as long as he should live." *Held*, that the fact that plaintiffs did not themselves seem to know what their contract was until all the evidence was in, gives the case a doubtful aspect.

6. ———: **Contract Not in Writing: Calling for Explanation.** Where the parties are old enough to take care of their own interests, were not ignorant, and the purported contract was to run for a lifetime and the consideration was not to be payable until the death of one party, the very fact that their contract was not in writing is a circumstance calling for explanation.

7. ———: **Not Talked of in Family.** The fact that an oral contract alleged to have been made between decedent and plaintiffs more than thirty years before his death, was not talked of in plaintiffs' family, and that their grown children had never heard of it, is sufficient to cast doubt upon its existence.

8. ———: **Conduct of Parties.** In determining whether the contract was ever made, which placed a lifelong obligation on those seeking to have it enforced, to live on the other's farm, improve it, and care for him in his sickness, their conduct in abandoning the farm and seeking a home elsewhere and in lightly bearing its burdens, is to be considered.

9. ———: **Admissions.** The value of admissions to prove the existence of an oral contract with decedent to give his entire property to certain relatives at his death, depends on the circumstances under which and to whom and when they were made. Casual conversations with deceased, held without any definite purpose with persons who had no interest in either hearing or remembering what he said, and who undertake to recall what was said many years afterwards, are not a high grade of evidence, are often untrustworthy, and are to be received with great caution.

10. ———: **Oral Contract: Unsatisfactory.** The evidence in this case is reviewed, and, *Held*, to fall short of, the standard of proof that a court of equity requires to establish the existence of an oral contract on the part of a deceased person to give all his property to a niece and her husband in return for certain services to be rendered him by them.

11. EQUITY COURT: Admission of Erroneous Evidence. When certain evidence was offered, it was objected to on certain specified grounds of incompetency. The chancellor overruled the objection, remarking that it had been decided by the Supreme Court that it was not error to admit incompetent evidence in the trial of an equity case. *Held*, that it is the rule in this court to review the evidence and find the facts in an equity case when the facts are in dispute, and to separate the competent from the incompetent evidence, but whether or not it was reversible error to admit certain incompetent evidence will depend on the circumstances of the particular case.

Appeal from Nodaway Circuit Court.—*Hon. Samuel Davis*, Special Judge.

REVERSED AND REMANDED (*with directions*).

*Cyrus A. Anthony, Alvin Bingaman, M. G. Tate, Ira K. Alderman* and *J. L. Funk* for appellants.

(1) The bill is not such as addresses itself to "the forum of conscience." Newham v. Kenton, 79 Mo. 384; Southworth v. Hopkins, 11 Mo. 338; Brevator v. Creech, 186 Mo. 570. "In order to the exercise of such jurisdiction, it must appear that the contract to be performed is certain, and fair in all its parts, is for an adequate consideration, and capable of being performed." Foster v. Kimmons, 54 Mo. 493. The bill is indefinite, more of a dragnet than a conscientious statement of a case in equity. Newham v. Kenton, supra; Grantham v. Gossett, 182 Mo. 671; Brevator v. Creech, supra; Preston v. Preston, 95 U. S. 202. The plaintiffs' petition shows that when they brought their suit they were uncertain themselves as to the terms of the contract, are obliged to amend, abandoning their first ground. Grantham v. Gossett, supra. When a plaintiff comes into court with a case of this kind there should be no doubt in the pleadings or proof as to the contract. They should know whether they were to "help improve it," "remain there aiding Sharp as long as he lived," or

whether they were to "take care of him when he was sick as long as he lived." Grantham v. Gossett, supra. To entitle plaintiffs to specific performance there must not only be a contract to enforce, but plaintiffs must have performed on their part to their detriment. Brevator v. Creech, 186 Mo. 572; Anderson v. Scott, 94 Mo. 645; Pom. Spec. Per. (1 Ed.), sec. 131. (2) Upon the record the findings and decree are not responsive to the issues. Plaintiffs cannot state one cause of action and recover on another. Reed v. Bott, 100 Mo. 67; Newham v. Kenton, 79 Mo. 385; Joyce v. Growney, 154 Mo. 253. (3) The proof does not establish any contract. "There must be satisfactory proof, not merely of some agreement, leading to acts of part-performance, in pursuance of which they are done, but sufficient to establish the particular agreement alleged. The proof on this point must be satisfactory, must be so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancelor that the particular contract as alleged was made and its terms and conditions clearly shown. Sitton v. Shipp, 65 Mo. 302; Asbury v. Hicklin, 181 Mo. 673; Rogers v. Wolfe, 104 Mo. 10; Cherbonnier v. Cherbonnier, 108 Mo. 264; Berry v. Hartzell, 91 Mo. 136. "There must be no equivocation or doubt." Goodin v. Goodin, 172 Mo. 48; McKee v. Higbee, 180 Mo. 297; Curd v. Brown, 148 Mo. 92; Kinney v. Murray, 170 Mo. 706; McElvain v. McElvain, 171 Mo. 257; Grantham v. Gossett, 182 Mo. 671; Emmel v. Hayes, 102 Mo. 195; Gibbs v. Whitwell, 164 Mo. 395. (4) There is no direct proof of any contract. "Courts of chancery have always been disposed to place but little reliance upon testimony of loose conversations or confessions of a party when used to overturn a legal title." Cornet v. Bertelsman, 61 Mo. 127; Berry v. Hartzell, 91 Mo. 137; Pitts v. Weakley, 155 Mo. 138; Fanning v. Doan, 139 Mo. 415. "Testimony of verbal admissions and statements of persons since dead is entitled to but small

weight.'' Modrell v. Riddle, 82 Mo. 36; Ringo v. Richardson, 53 Mo. 394; Berry v. Hartzell, 91 Mo. 136. The interest and partisanship of witness Collins renders his testimony of little weight. Paris v. Haley, 61 Mo. 460; Greenleaf on Evidence, secs. 45-97, 200; State v. Moxley, 102 Mo. 390; Kinney v. Murray, 170 Mo. 707. Fargo's testimony should have been excluded—what he knew, if anything, was obtained from Sharp when consulting him in regard to his will. Sweet v. Owens, 109 Mo. 7; Meier v. Thieman, 90 Mo. 433; Cross v. Riggans, 50 Mo. 336. (5) The motion to exclude the evidence of witness Collins should have been sustained on account of his interest in the result. Sharp dead, Collins liable on the cost bond, interested in looking up evidence, employing attorneys, etc. Greenleaf on Evidence (14 Ed.), secs. 391-5, 401-2; Meier v. Thieman, supra; Bagnell v. Bank, 76 Mo. App. 124. (6) ''To take a case out of the Statute of Frauds on the ground of part performance of a parol contract, the acts relied upon for this purpose should be definite and referable exclusively to the contract, and the contract should be fully established in all its terms.'' Charpiot v. Sigerson, 25 Mo. 66. ''The rule is well settled that acts which are referable to something else than the verbal agreement, and which may ordinarily be accounted for, do not constitute a part performance of it.'' Gibbs v. Whitwell, 164 Mo. 391; Kinney v. Murray, 170 Mo. 701; McKee v. Higbee, 180 Mo. 299. Equity decrees relief in such cases for the faithful performance of the contract, fully executed on one side. Teats v. Flanders, 118 Mo. 669; Southworth v. Hopkins, 11 Mo. 339; Kinney v. Murray, 170 Mo. 701; Veth v. Garth, 92 Mo. 104; Pomeroy v. Fullerton, 131 Mo. 592.

*W. A. Blagg, T. A. Cummins* and *E. A. Vinsonhaler* for respondents.

(1) Oral contracts of the kind stated in the petition, when proven according to the standard of proof

required, and shown to be performed, and to suffer it to go unenforced would be to suffer a fraud to be perpetrated, will be decreed to be specifically performed. Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Nealey v. Simpson, 113 Mo. 340; Nowack v. Berger, 133 Mo. 24; Steele v. Steele, 161 Mo. 575; Lynn v. Hockaday, 162 Mo. 111; Kinney v. Murray, 170 Mo. 700; McElvain v.. McElvain, 171 Mo. 257; Gooden v. Gooden, 172 Mo. 48; Asbury v. Hicklin, 181 Mo. 658. An agreement to dispose of property by will, in a particular way, if made on sufficient consideration, is valid and binding; and partial performance of a verbal contract of this description will take it out of the statute where refusal to complete it will work a fraud on the other party. Gupton v. Gupton, 47 Mo. 37. There are things which money cannot buy; a thousand nameless and delicate services and attentions, incapable of being the subject of explicit contract, which money, with all its peculiar potency, is powerless to purchase. The law furnishes no standard whereby the value of such services can be estimated, and equity can only make an approximation in that direction by decreeing specific execution of the contract. Sutton v. Hayden, 62 Mo. 101. And .it is sufficient to show a valid agreement to convey whatever property may remain at the death of the party contracting to convey. Sutton v. Hayden, 62 Mo. 115. In the case at bar it is not specified how the transfer of the property was to be made, but whilst this is true it is immaterial; the intention to transfer the property is the main thing; the method by which the intended result was to be attained was wholly immaterial. The contract entered into might well have been discharged by deed or by will. Sharkey v. McDermott, 91 Mo. 656; Sutton v. Hayden, 62 Mo. 101; Gupton v. Gupton, 47 Mo. 37; Hall v. Harris, 145 Mo. 614. (2) The Supreme Court will, in equity cases, where witnesses have been before the court and testified orally, and the testimony is conflicting, or is

evenly balanced, so far defer to the finding of the chancellor as to sanction it by affirmance. Benne v. Schnecko, 100 Mo. 250; McElroy v. Maxwell, 101 Mo. 294; Brown v. Fickle, 135 Mo. 405; Robertson v. Shepard, 165 Mo. 375; Nichols v. Nichols, 39 Mo. App. 291; Chouteau v. Allen, 70 Mo. 336; Chapman v. McIlwrath, 77 Mo. 43; Erskine v. Loewenstin, 82 Mo. 309; Dunivan v. Dunivan, 157 Mo. 160; Halstead v. Mustion, 166 Mo. 495. (3) The objection under point four of appellants' brief to the testimony of S. B. Fargo is not well taken and is certainly unavailing in this case. Under the case of State v. Hedgpeth, 125 Mo. 14, counsel for respondents maintain that Fargo's testimony was admissible and should have been considered and weighed by the chancellor trying the case, but, as a matter of fact, the trial court did not consider this testimony but ruled against its admission. Counsel for respondent now respectfully asks this court to consider such evidence as competent evidence, for we understand the rule to be that in equity cases where the evidence is preserved in the record, this court can consider that which is competent in its own finding. Baxter v. Donnell, 69 Mo. App. 590; Padley v. Neil, 34 Mo. 370; Reynolds v. Kroff, 144 Mo. 448.

VALLIANT, J.—This is a suit in equity for the specific performance of a contract alleged to have been made in 1868 between one H. Monroe Sharp, who has since died intestate, on the one part, and the plaintiffs, who are husband and wife, on the other. The contract, as the petition alleges, was that plaintiffs, who were then residing in Clinton county, were to move to Nodaway county and there reside on a farm owned by H. Monroe Sharp, help improve it and remain there, aiding him as long as he should live and at his death they were to have all of his property.

After all the evidence in the case was in and both sides had rested, the plaintiffs were permitted, over the

defendants' objection, to amend their petition, by erasure and interlineation, by striking out the words, "help improve it and remain there aiding him," and inserting in lieu thereof, "take care of him, the said Sharp, when he was sick and as long as he should live," etc. The alleged contract was not in writing.

The intestate died in August, 1902, at the age of seventy-eight, leaving a farm of 240 acres in Nodaway county, 80 acres in Warren, and 80 acres in Morgan county, and personal property estimated at $700. Debts against the estate amounting to nearly $1,000 were allowed in the probate court.

The intestate had never married. He had had four brothers and three sisters, all of whom had died before his death, except one brother, Michael Sharp, who is now living in North Carolina. The plaintiff Dillie Russell is the daughter of one of the deceased brothers. The defendants are the surviving brother, the descendants of the deceased brothers and sisters, and the administrator of the estate.

The petition states that the plaintiffs fully performed the contract on their part and pray a specific performance on the other part by decreeing that they have the whole estate subject to the claims of the administration.

The defendants answered denying the allegations of the petition and pleading the Statute of Frauds.

The trial resulted in a finding of the issues in favor of the plaintiffs and vesting the whole estate, subject to the claims of the administration, in the plaintiff Dillie Russell. Defendants appeal.

The testimony on the part of the plaintiffs tended to prove that in 1868 they, being then married, moved from Clinton county to Nodaway and lived on the farm of Monroe Sharp, the bachelor uncle of plaintiff Dillie Russell, he and they living together in his dwelling-house on the farm, Russell renting from Sharp part of the farm and paying him as rent therefor one-third of

the crop, Sharp retaining the rest of the farm in his own care. In 1870 or 1871 Russell bought a forty-acre farm about a mile from Sharp's, moved there with his family and lived there two years, after which he sold the forty acres and moved back to Sharp's and again rented a part of the farm from him, Sharp charging him more rent than in the former years. As Russell's family increased in numbers the old bachelor uncle found it more agreeable to live alone and he accordingly built him a little house about a quarter of a mile from the house occupied by the Russell family and moved into it and he there lived practically alone for the last twenty or twenty-five years of his life, doing his own cooking, housekeeping, etc., and managing the part of the farm not rented to Russell. In his last illness, which began about three months before he died, he became helpless and was taken by the Russells to their house and was cared for and attended by them and died there. In this last illness he required much care and service of a personal character not agreeable to render, but the care was bestowed and the service rendered in a kind manner.

During the twenty or twenty-five years when he lived alone, Mrs. Russell frequently visited him and carried him bread that she had made and was kindly attentive to him, and her children also visited him. But during the most of that period he was able to take care of himself and did not require much personal service.

The plaintiffs' evidence also tended to show that they planted fruit trees, built a corncrib, stable, henhouse and smokehouse, did some clearing, fencing, etc.

The testimony adduced to prove the alleged contract consisted entirely of admissions the old man was said to have made. This testimony may be summarized as follows:

L. J. Wood, a neighbor who lived four or five miles from Sharp, testified that he had a conversation with him twelve or thirteen years ago in which Sharp said

that Russell had been with him about thirty years and that "I told him if he came here and stayed with me, I would see that he got my house, and I calculate to make my word good if he stays with me." Sharp also said that Mrs. Russell had always done his washing and mending.

Logan Holt had known Sharp when they were young men, worked as carpenters together, "I and him used to be great old chums." Witness had lived in town and had not seen so much of Sharp in the last twenty years, but still owned a farm in that neighborhood, would see him occasionally. Before Russell came on the farm Sharp told witness he wanted to get the Russells to come and stay with him and help him. On one occasion witness reminded Sharp that he was getting old and asked him what he was going to do with his property, to which he answered: "Dillie Russell is going to get what I have. I allow for Dillie to have it." He said she had always been there, waited on him and took care of him. Witness being asked by plaintiffs' attorney if Sharp ever said to him that he (Sharp) had told the Russells that if they would come there and stay with him until he died Dillie should have the property, he answered: "I wouldn't say right positive, but that is my impression. Now this is a long way back to recollect anything." On cross-examination he said it was at least twenty years ago that he had this conversation with Sharp.

T. H. Williams had lived in the neighborhood and had "worked for him a little" and had had "a few words" of conversation with him about his relation with the Russells. It came about in this way: "He asked me how I came there with the folks that I did. I told him they raised me and of course they expected me if they had no children to have what property they had at their death . . . I told him I understood that was the contract between him and Mr. Russell and he said it was, . . . he aimed for them to have what he had at his

death." This conversation was had twelve or thirteen years ago.

Norton Roberts had done some work for Sharp about two years ago; he said: "I asked him what he was going to do with his property, he was getting old . . . what he allowed to do with his property when he passed over; he said he allowed for them folks back there where we got dinner to have it." They had had dinner at the Russells'.

Plaintiffs' main witness, Collins, testified that in 1898 he reminded Sharp that he was getting old, had no family, and asked him why he did not sell the farm and move to town, to which the old man answered: "I made a contract with Russell before he moved on this farm, him and his wife, that if they would come on this farm and live with me and take care of me when I am sick, at my death all my property goes to Russell and his wife." Witness also testified that the Russells always took care of the old man when he was sick. On cross-examination this witness stated that he had no interest in the result of the suit but he admitted he had been very active in aiding Russell in the matter, was surety on the bond for costs, had helped hunt up witnesses, had gone with Russell every time he went to consult his attorneys. On being asked if he had not said that he intended to carry the case to the Supreme Court and keep right along with it if it cost him eighty acres of land, he said: "Yes, sir, yes, sir, I am going to say that I said it, let me tell you about that now. . . . I was accused by the heirs of taking a bribe and getting eighty acres of land. I says to Culp: 'I am no cheap John lawyer.' I says, 'You might tell them fellows, if it will help them out a little, that Collins will spend eighty acres of land,' as a kind of joke or burlesque. Q. You did in that way? A. Yes, I own up to that, I did say to Thomas Glenn that it would be worth $1,000 to me to find a witness that would testify to this contract. Q. I will ask you if you didn't tell Wesley McKibber about the time this suit was

brought that you considered yourself a member of the law firm that was trying the case? A. I did, yes, sir, I was talking around there. I done that in a joking way. . . . I admit to it. It was kind of joke or burlesque to help the boys have a little fun. I did not tell Tom Glenn that if Russell would let me manage the case I would get at least 80 acres for him; let me tell you what I did tell him. Q. Well go on. A. Now I says if Russell manages that case right he will get a home out of it. He is entitled to it from what I know about the case and I believe he ought to have it, I believe that justice would give it to him, according to what Monroe told me about the contract." On further cross-examination witness said that at first Russell was undecided whether he would put in a bill of expenses in the probate court against the estate or bring this suit. On re-direct examination he said that Mr. Sharp was a peculiar man, rather superstitious and kept his business very quiet to himself.

S. B. Fargo testified that he was an attorney at law, that about two years ago Sharp spoke to him about writing his will, and later they met on the street in Skidmore by the public well and Sharp told him he was ready to have the will written; he said, "Well, I have got my mind made up how I want my property to go; I contracted the home place to Alex. Russell and his wife . . . There is more land there now than there was when Mr. Russell went on it, but they were to have the place for their taking care of me when I am sick and burying me. . . . The other property I have disposed of any way, or will if you write my will just like that. . . . I made a contract with Russell about thirty-five years ago and I can't annul it . . . I have fixed it with Russell and his wife, they will take care of me and bury me and they are to have the home place. They have grubbed it out." The will, however, was not written, because the witness asked five dollars for writing it, and Sharp offered two and a half, to which wit-

ness replied, "Never on this earth, Monroe." On cross-examination this witness stated that he was employed by Russell as an attorney in this case (he does not, however, appear as attorney of record). On being asked if he had a contingent fee in the case he said: "No, sir, he pumped the cash right up, what he paid . . . Q. Who came first, Russell or Collins to employ you? A. Well, sir, Russell. Russell and I—I can tell you right where we were. Q. Never mind that. A. Sitting on a seat—. By the Court: Never mind that. A. All right, Judge, I will tell you all I know about it fairly and honestly, and no more; I ain't here for—money don't warp me—not one iota. I am as poor as anybody. Q. How was it? Plank it out. Let's get something? A. He gave me a retainer fee and he says: 'I can get money at Maryville when we are out there if you need any.' I says, 'Yes'. He promised me just so much money. Now no conditions pro or con. Q. How do you appear here to-day, as an attorney or as a witness? A. Sir? Q. Do you appear here to-day as an attorney or as a witness. A. I came here as a witness, because I was subpoenaed."

Al Russell, a son of plaintiffs, twenty-nine years old, testified that about eight years ago he went to Mr. Sharp to ask him to build a house for him on the farm, but Mr. Sharp wanted witness to build it and live on a certain forty acres; witness asked what he would do with the house in case of Sharp's death, and the latter said that at his death the witness's parents were to have the land, and he guessed they would not make him move it off. He told witness that if they stayed with him and took care of him during his last sickness they were to have it all. Witness did not recollect that the old man had had a spell of sickness for the last twenty or thirty years.

J. S. Bilby testified that about twenty-five years ago he went into Mr. Sharp's house to get out of the rain, and during the brief visit joked him about getting

married, and asked him what he was going to do with his
property, to which he replied that he had decided to
give it to Mrs. Russell, or had agreed to give it to her,
witness did not quite remember which.

The testimony on the part of the defendants was to
the following effect:

Monroe Sharp was seventy-eight years old when
he died; until within the last few years of his life he
was an active, industrious farmer, and generally in good
health. When the Russells first came on the farm they
lived in his house and he boarded with them. During
the two years 1870-2, when they had moved away, he
boarded with a neighbor, Mrs. Nunnelly, and paid her
for same. When the Russells came back in 1873 Sharp
boarded with them again for several years until he
built the little house into which he moved and where he
lived alone until his last sickness. While he boarded
with the Russells he paid Mrs. Russell two dollars a
week for his board and twenty-five cents a week for his
washing. There was nothing in the intercourse be-
tween Sharp and the Russells that was not usual be-
tween a landlord and a tenant, except a friendly rela-
tion to be expected between an uncle and his niece
and her children living on his farm. The improvements
put on the place by Russell were of temporary character
and very inconsiderable in value. In 1889 Russell, de-
claring that land had become so high in Nodaway coun-
ty that he could not hope to get a home there, made a
run for a homestead in Oklahoma, but failed to get it
and returned to the farm. Russell from time to time
made statements to witnesses inconsistent with the con-
tract he now asserts; to one witness he said that he had
tried or was going to try to get Sharp to give him a
deed to half of the farm and if Sharp would not do it
he would get the land when Sharp died; to another wit-
ness he said that he had lived on that 120 acres twenty
years and the law gave him a title; to others he said that
two of Monroe Sharp's brothers, then dead, had told

him if he would go on the place and take care of Monroe while he lived they would see that he got the place at his death; to others he said that he was going to put in a bill against the estate for services in the last sickness, and as there was sixty-three days of nursing he was entitled to count eight hours a day and put in the bill for three times sixty-three days. Russell heard of the old man's illness from a neighbor who had seen him the night before, and when Russell went to see him he found him helpless—paralyzed—and had him carried to his house where he remained until his death something over two months. In addition to the nursing and attention given by the family there were two nurses hired who were paid out of the estate. The last six years of the old man's life he was not very well able to care for himself and he suffered for attention, though Mrs. Russell and her children did visit him occasionally and gave him some attention; the last two years of his life he gave signs of dementia and general breaking down, and when he was finally taken to the Russell home he was in bad way.

The foregoing is the substance of the large volume of the evidence in the case.

The contract alleged in the petition is within the scope of the Statute of Frauds; it is of such a character that the law has deemed it prudent to declare that it will not be recognized unless it is in writing and signed by the party sought to be charged. The facts in this case illustrate the wisdom of this policy; if the law would allow an estate to be diverted from the statutory course of descent, by oral evidence of an oral contract alleged to have been made more than thirty years ago, after the death of the party whose estate is sought to be affected and whose lips are therefore sealed, it would be not only a constant menace to the peace of families, but a constant temptation to the commission of fraud and perjury. It was for that reason that that which we call the Statute of Frauds, which in its original form

adopted in England recited in its preamble that it was designed to prevent fraud and perjury, was adopted. That statute has so commended itself to the wisdom of the lawmakers, that it has been adopted in all countries deriving their laws from England.

But to the Anglo-Saxon mind a law, however wise and just in its general application, is not of such inflexible character that it will always be applied regardless of circumstances where its application would result in the perpetration of fraud. So it has been said that equity in such case will interpose to prevent the Statute of Frauds from being made the instrument of fraud. And therefore it has come to be the recognized authority of courts of equity in England and in this country to require a party to observe and perform his contract though it be within the scope of the statute and be not in writing, if it has been in good faith fully performed by one party and if refusal to perform it by the other would result in great injustice and the perpetration of a fraud. But when a court of equity exercises this authority it by no means brushes aside the Statute of Frauds or impugns its wisdom; on the contrary, it is so careful to see that the fraud which the statute was designed to guard against is not perpetrated that it really adds to the statute a new strength by demonstrating that it may be so administered that justice will not suffer or the statute made the instrument of the very evil it was designed to prevent.

And how does a court of equity accomplish this? By the simple common-sense rule of requiring one who invokes the aid of equity in such case to prove his case, not by vague or shadowy evidence, not even by a mere preponderance of evidence, but by evidence so unquestionable in its character, so clear, cogent and convincing, that no reasonable doubt can be entertained of its truth; that no such doubt can linger either as to the existence of the contract or the certainty of its terms or that the plaintiff has wholly performed his part.

We have said this so often in this kind of cases that we are at a loss to find terms in which it can be said again with more effect. [Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Nowack v. Berger, 133 Mo. 24; Steele v. Steele, 161 Mo. 575; Lynn v. Hockaday, 162 Mo. 111; Kinney v. Murray, 170 Mo. 700; McElvain v. McElvain, 171 Mo. 257; Goodin v. Goodin, 172 Mo. 48; Asbury v. Hicklin, 181 Mo. 658.] The same thought runs through many other cases in our reports referred to in the briefs of counsel on both sides.

Does the plaintiff's evidence in the case before us come up to this standard?

Before discussing the evidence let us look at some of the circumstances surrounding the case.

According to the plaintiffs' petition as it was when the parties went to trial, and as it was until all the evidence was in, the contract was that the plaintiffs were to come to Nodaway county, there reside on the farm of Monroe Sharp, help improve it and remain there aiding him as long as he should live, and for that, at his death, they were to have all of his property. Under that statement of the contract the part the plaintiffs were to do was to help improve the farm and aid Monroe Sharp. The idea that the plaintiffs were to take care of him when he was sick did not appear in the case until the evidence had closed, then the allegation of helping to improve the farm was cut out and that of attending Sharp in sickness was inserted in its place. An amendment in a pleading which does not change substantially the claim or defense, may in a proper case be allowed by the court to be made even after the evidence is closed. [Sec. 657, R. S. 1899; Carr v. Moss, 87 Mo. 447.] It is unnecessary in this case to decide whether the court exercised a wise discretion in allowing this amendment to be made when it was, because we are not now viewing it under the rules of pleading,

but are considering it as it bears on the probative character of the whole case as made by the plaintiffs' pleading and proof. Sometimes a party may make an amendment at that stage of the proceeding without impairing confidence in his case, but when, as here, something more than a mere preponderance of evidence is required, the fact that the plaintiffs themselves seem not to have known what their contract was until all the evidence was in, gives the case a doubtful aspect to begin with. If they were not certain themselves as to the essential terms of their contract, how could they hope to establish it beyond a reasonable doubt in the mind of the court? In the beginning, they said that they were to help improve the farm, aiding Sharp as long as he lived, and for that they were to have the whole of his property at his death, and at the trial they adduced evidence tending to show that they made improvements, but the evidence for the defendant on that point left it at least very doubtful if there were any lasting or valuable improvements made by them; then they turned their attention to the subject of the nursing and caring for the old man in his last illness, and in the end amended their petition to rest on that ground. That is not a confidence-inspiring practice in this kind of a case.

There was no attempt made to show why this contract was not reduced to writing. This is not like many of the cases that have come before us where the alleged agreement was for the adoption of a young child who was taken into the family and reared. In such case the child could not be expected to see to the execution of the deed of adoption, but here were parties old enough to take care of their own interests and the very fact that there was no writing is a circumstance that calls for an explanation on their part. These were not ignorant people; it is unreasonable to presume that either Sharp or the Russells would have entered into such a contract to run for a lifetime, with no writing to show for it. The evidence shows that Russell is a man of sense

and that he appreciated the importance of a writing to prove such a contract.

There is another fact that casts doubt on the plaintiffs' case. If they spent the thirty-odd years of their lives on this farm as in the fulfillment of their part of the alleged agreement, it would be most natural that their children who were born and reared on the farm would have at least heard something about the contract, yet although three of them were witnesses for the plaintiffs in the case, it seems that they never heard of it.

One of the daughters, Miss Ora Russell, twenty-four years old, testified that she had never heard of such a contract, and it appears inferentially from the testimony of the son that he had never heard of it. It is highly improbable that there should have been a contract of such importance to their welfare yet it was never spoken of in the family.

When men reach or are approaching an age and condition in which it behooves them to provide for their own nursing when they will be no longer able to take care of themselves, it is quite natural that contracts should be made of the kind alleged to have been made in this case, and when made they are deemed in law meritorious and are upheld. But there was no such age or condition in sight in 1868 when Sharp is said to have made this contract. He was then in the prime and vigor of his life, the evil days had come not, nor had the years drawn nigh when he might naturally apprehend the necessity of such guardianship. The common experience of mankind does not teach that men in the full prime and vigor of life brood upon such subjects. We do not, of course, say that a man of Sharp's age and strength and means could not make such a contract, but we do say that he is not so apt to do so as one whose condition suggested a necessity for it, and that that is a fact to be considered when we are weighing the evidence.

Plaintiffs rely upon the full performance on their part of the contract to take it out of the operation of the Statute of Frauds. The obligation of the plaintiffs under the contract, if there was such obligation, appears to have set lightly on them. According to their pleading theirs was a continuing duty, to run as long as they and Sharp should live, yet after remaining two years on the farm, they abandoned it, bought a farm of their own and took up their abode on it, and for two years declared by their conduct that their contract with Sharp was ended. Then for some cause unexplained they sold the forty acres they had bought and moved back on the Sharp farm and thereafter paid higher rent than before. Then again when the Territory of 'Oklahoma was thrown open to the public, Russell, declaring that land in Nodaway county had risen in price so high that he could not hope to obtain a home of his own there, tried his fortune in Oklahoma, and, if we judge him by his conduct, we are bound to presume that if he had been successful there he would have abandoned the Sharp farm forever, but failing there he returned. Is that the conduct of a man who is to be rewarded as for the faithful observance of a lifelong contract?

The evidence on which the plaintiffs rely to prove their alleged contract consists entirely of admissions said to have been made by Monroe Sharp in his lifetime.

The value of admissions as evidence depends on the circumstances under which and to whom and when they were made. Sometimes admissions are of a high order of evidence but sometimes also they are of little weight. Here the evidence, except that of witness Fargo, related to fragments of casual conversations held without any definite purpose, with persons who had no interest in either hearing or remembering what was said, and who undertook to recall it after many years and some of whom at least, according to defendants'

evidence, would perhaps have never remembered it if the industry of Collins had not brought it back to their minds.   There was nothing to impress these alleged conversations on the minds of either of these witnesses and, therefore, without imputing to them a purpose to speak falsely, we may well say that they are so liable to have put a wrong interpretation on what was said or on what, after many years have passed, they now think was said, the testimony is not trustworthy.   Persons attempting to repeat from memory conversations they have heard are liable, under the most favorable circumstances, to make mistakes and give wrong impressions, therefore such is never a high grade of evidence.   But when the conversations were of a casual character in which the witness had no interest and there was no reason why he should remember it, if he does undertake to recall it after many years, we are bound to regard it as a low grade of evidence.   Under such conditions such testimony, even if it related to conversations said to have been held with men yet living, is of little value, but when under those circumstances a witness undertakes to say what men who are now dead said, we ought to receive the testimony with a great deal of caution.   But except in the testimony of Collins and Fargo, the admissions that Sharp is said to have made are as indicative of a benevolent voluntary intention to provide for Mrs. Russell by will as they are of a contract or even more so.

The only witness whose testimony indicates a serious purpose for the conversation which he attempts to repeat is Fargo, who said that Sharp wanted him to write his will, but even that conversation occurred at an accidental meeting of the witness at the town pump.

When this witness was offered and it came out that Sharp was talking with him as an attorney at law, with a purpose of employing him to write his will, objection to the testimony was made on the ground that the conversation was under the seal of professional confidence.

The court overruled the objection, remarking at the time that it had been decided by the Supreme Court that it was not error to admit incompetent evidence in the trial of an equity case. The learned judge did not mention the case in which the decision referred to was made and we are not aware of any case in which this court has so held. But as it is the rule in this court to review the evidence and find the facts in an equity case when the facts are in dispute, we have not always held that it was reversible error when we have found that incompetent evidence had been admitted, because in most cases we could separate the incompetent from the competent and reach a conclusion from the legal evidence, but we have never meant to say that it was not error to admit incompetent evidence in an equity case or that the finding of the trial court would never be reversed for such error. Whether for such an error the finding would or would not be reversed would depend on the circumstances of the particular case. Sometimes even in an equity case the judgment may be reversed and the cause remanded for a new trial. In the case at bar, however, after hearing the testimony of this witness the learned judge reconsidered the point and excluded the evidence.

Even if the evidence of this witness is competent it is not clear and is not satisfying. In one breath he says that Sharp told him that he was now ready to have his will written and had made up his mind as to how he wanted his property to go. That would indicate that up to that time at least the disposal of his property by will was a matter he had held in doubt and he had only just then made up his mind about it. Then according to the witness, Sharp went on to say: "I contracted the home place to Alex. Russell and his wife. . . . They were to have the place for them taking care of me and burying me. . . . The other property I have disposed of any way, or will." This witness on cross-examination admitted that he was under the pay of the

plaintiffs and had helped Collins to work up the case; he said that he was employed as an attorney in the case. But if he was an attorney and was in good faith employed as such in the case he would most likely have appeared as such on the record and have taken some part in the trial; the character of his employment would not have been kept secret.

Plaintiffs' main witness was Collins. He testified by way of introduction to the conversation that in 1898 he reminded Sharp that he was getting old and advised him to sell his farm and move to town. This introduction implies that this witness was taking the interest of an intimate friend in the old man and it also implies that there was then something in the old man's condition and environment that suggested that he ought to be where, in case of need, he could be attended to. If he was on the terms of intimate friendship that his preamble implies and if the Russells were giving the old man the kind attention it is now claimed they gave him, this witness would doubtless have known it and therefore there would have been no occasion for such advice.

But the evidence shows that Collins and the old man were at that time not on terms of good neighborship; if not actually unfriendly they were at least not friendly. Witnesses for the defendants testified that Sharp was a reserved man, and was not in the habit of talking about his business, and this witness Collins himself said so, yet he would have the court believe that in this conversation in 1898 the old man laid aside his habitual reserve and confided to the witness that he could not take the advice to sell out and move to town because he was under constraint of a contract made with Russell before he moved on the place that if they would come to the farm and live with him and take care of him when he was sick they should have all his property at his death. According to this witness they were to have, not the home place merely, as Fargo said, but

everything, including the land in Warren county and Morgan county.

That this witness is the mainspring in the prosecution of this suit, and has taken on his hands more than would be expected of a disinterested neighbor, appears from his own evidence, and if the evidence of some of the defendants' witnesses is believed he has been unduly active in the matter. His testimony is not convincing.

Taking the case with all the circumstances of improbability surrounding it, the evidence adduced to sustain the plaintiffs' cause falls short of the standard of proof that a court of equity requires in such case.

The judgment is reversed and the cause remanded to the circuit court with directions to enter judgment for the defendants.

All concur, except *Brace, P. J.,* absent.