JUNE TERM
1837.

Graham & others
v.
O'Fallan, ex'r of
Mullanphy.

4   601
67a 538

**GRAHAM & OTHERS v. O'FALLON, EX'R. OF MULLANPHY.**

1. Whether a witness, who is both devisee and heir at law, is competent to establish a will, depends on the question, whether he will take more or less by the will than by the intestacy. See ante. p. 341.

2. Hence, where the real estate is proved to be worth about $2,250,000, and the share of witness, in case of intestacy, about $285,000, whilst under the will, he gets only $50,000, and a remote contingent interest in an undivided share of the balance, which in no event would equal his share in case of intestacy, the interest of the witness is clearly *against* the establishment of the will, and he is a competent witness.

3. The witness, whose evidence established the contents of the will, also stated, that the last time he read the same before it was executed, there were several blanks:—which blanks, it was also proved, were found, after the death of testator, to be filled up in testator's hand-writing;—it being *possible* from the evidence, that the blanks were filled either before or after execution, it was held, that the presumption of law will be in favor of the *right time to make the instrument good*, to wit: that the blanks were filled before the will was signed and attested.

4. *One* witness is sufficient to establish the contents of a lost will.

*Allen* and *Geyer*, attorneys for plaintiffs in error:

Admitting the testimony before the court to be competent, the questions arising thereon are,

Was the paper alleged to be the will of John Mullanphy, of which a copy is before the court, executed with the due formalities of law?

If so, is the supposed copy, a true copy of that will?

The paper alleged to be the will, is not the same in its detail, as when executed. Various blanks then existing were filled up after its execution, and there has been no republication—Toller's Law of Executor's, p. 1; and is therefore, not the will of John Mullanphy, or the legal declaration of his intention, directed by him to be performed after his death. A will cannot be good and approved in part.—Tol. Law of Exr's. p. 71.

But if it was, the supposed copy is not a true copy of that will, in legal contemplation.

1st. It is not proved by two witnesses—Toller's Law of Exr's., p. 69; Williams on Exr's., p. 209. The testimony of J. Spalding and B. Mullanphy do not prove the same thing.

2nd. B. Mullanphy, who knows the conformity of the supposed copy to the alleged original, is incompetent.— A codicil being a mere supplement to a will—(Tol. Law of Exr's., p. 5,) supposes the pre-existence of a will, which must be known independently of the codicil; and to prove the will, B. Mullanphy is an incompetent witness, on ground of interest.

*H. R. Gamble*, attorney for defendants in error:

1st. That the will and codicil were duly executed, according to law.

2nd. That they were in existence, uncancelled, and in perfect state of preservation, after the death of the testator.

3rd. That they were either lost or mislaid after the death of the testator.

4th. That the copy exhibited is a true copy.

5th. That the contents of the originals are fully proved.

JUNE TERM
1837.

Graham & others
v.
O'Fallon, ex'r of
Mullanphy.

Statement of the case, and opinion delivered by McGirk, Judge.

O'Fallon presented his petition to the county court of St. Louis county, together with a *supposed* copy of the last will and testament of John Mullanphy, deceased, praying to have the same proved and allowed. Whereupon, Richard Graham, for himself and wife, the daughter of the deceased; James Clemens, for himself and wife, the daughter of the deceased, and divers others of the children of said deceased, came into court and objected to the establishment of the will, and entered a *caveat* against the proceedings. The court went on to hear the testimony, and after hearing the same, pronounced a decree: that the paper offered as a copy was not proved to be a copy of said last will. Proof was also given, to show that at, and after the death of the deceased, a last will and testament was in being. On a hearing of all the evidence adduced, the county court decreed that Mullanphy died intestate. From which decree, O'Fallon appealed to the circuit court of St. Louis county; which court reversed the decree of the county court, and Graham and others have appealed to this court. It was proved by Josiah Spalding, that in the year 1830, he thinks in February or March, John Mullanphy, the supposed intestate, came to him in his office, he being a lawyer, living in St. Louis, and stated to him that he desired him to draw a will for him. Mullanphy, as he was going to Washington City; was old, and could not tell what might happen to him in travelling so far.

That accordingly, in February or March, Mullanphy dictated to the witness a rough draft, which rough draft, the witness sets out in his deposition. That after the rough draft was made, the witness drew the same off in form, and left in the body of the same several blanks for the names of Trustees and Executors, and for several

77

JUNE TERM
1837.

Graham & others
v.
O'Fallon, ex'r of
Mullanphy.

sums, as is apparent in the said rough draft. The said will containing the same matters as mentioned in the draft, in the usual phraseology common to wills, beginning, "In the name of God: Amen," as witness thinks, and ending, "In testimony whereof, I have hereunto subscribed my name." The witness wrote at the foot of the will, a certificate for the signature of witnesses, with a blank for the day and year, which was filled up with the date of the execution. The said will was examined by John Mullanphy, and was in that state all read over to him by the witness, and Mullanphy being satisfied with it, went out of the office of the witness, and brought in several gentlemen for the express purpose of being witnesses to his execution of the will; of whom, witness recollects William Higgins, now deceased, and thinks he remembers Thomas Houghan. That after Mullanphy and witnesses had entered the office, the witness in the presence, and hearing of all, read to them the certificate above mentioned, and Mullanphy declared the instrument aforesaid, and then and there exhibited to be his last will and testament, and thereupon signed the same, all being present as aforesaid, and seeing the testator so sign;—and the witnesses at the request of Mullanphy, he looking on, and at his request, they subscribed their names as witnesses. The witness says, if he knows what the due executing of a will is, the same was duly executed under the laws of Missouri. The testator, as he told the witness, took the will and deposited it in the Branch Bank at St. Louis, for safe keeping. The witness says, afterwards in November, 1831, the testator applied to him to draw a codicil to the will previously executed, as above stated;—Mullanphy said he must have certain alterations made therein, which could not be delayed. Mullanphy went and brought the original will executed as above stated, sealed in an envelope;—witness took off the envelope, and drew a codicil for Mullanphy, by his dictation—and the witness here states the substance of the codicil; says that he does not know that the codicil was then executed, but thinks Mullanphy told him it was.

The witness on cross examination says, that the blanks now apparent in the copy here produced, correspond with those left in the rough draft. He farther says, that after said will was drawn by him as aforesaid, and examined by the testator and ready for execution, he does not know whether the blanks were filled before execution. Nor does he know, or remember whether said Mullanphy, after the will was drawn and ready for execution, took

JUNE TERM
1837.

Graham & others
v.
O'Fallon, ex'r of
Mullanphy.

the same away, or not before the same was executed.—
When it was executed, it was so presented to the witnesses for their signature that they could not read the contents; nor does he remember whether it was executed on the same day the same was finished for execution, or not. The witness further states, that a day or two after the death of the testator, he was called on by some of the heirs of Mullanphy to go to the late residence of the deceased. That he did so, and in course of conversation, he informed the family that there undoubtedly was a will, and that they had better look it up. He further says, that shortly afterwards, he was called on again by some of those interested, to go to the mansion house of the deceased, in St. Louis, and that he went, and that he found in the hands of some of the members of the family, the original will and codicil by him above mentioned, with the signatures of John Mullanphy to both of them, in the places usual for such signatures. There were also at the proper places, under the certificate for witnesses, subscribed witnesses names. Witness says he is acquainted with the hand writing of John Mullanphy—the signature to the will and codicil he saw as aforesaid was Mullanphy's—whether Houghan's name was to the codicil, he does not remember, but knows it was to the original will. The witness further states, that the blanks left in the will as by him above stated, were filled in the hand writing of the testator, with the exception of that part of the will, where the great mass of the estate was conveyed in trust, to Trustees for certain purposes. There was a blank for the names of the Trustees unfilled, but the blank left for the names of Executors was filled with the names of G. Collier, John O'-Fallon, and thinks the name of Thomas Biddle was inserted.

That the blanks left in the will for an annuity to the widow were filled with a certain sum, in the proper hand writing of John Mullanphy. And on the occasion above mentioned, of witness seeing said will and codicil, Bryan Mullanphy, one of the children of the deceased, undertook to make a copy of the same, and commenced doing the same in the deponents presence. Afterwards, said Bryan handed to witness a copy, or what he supposed to be a copy, and witness examined as he thinks, some clauses in the same, and so far as he examined the same, he has no doubt it was a copy, but does not know.

Nothing the witness saw in it conflicted with witness's recollection of the will and codicil, then fresh in his mem-

JUNE TERM
1837.

Graham & others
.v.
O'Fallon, ex'r of
Mullanphy.

ory; nor does he know whether that copy is the same now here produced. Witness says, some days thereafter, he again went to the mansion house of the deceased, and again saw the said will and codicil, in the same state of preservation as when executed; had the same in his possession for an hour, and conversed with the family about all or nearly all the provisions in the same;—says also, that when the testator executed the same, he was of sound and disposing mind. It was also proved by other witnesses, that the said will and codicil were lost, and could not be found. It was also proved by one of the subscribing witnesses to the will and to the codicil, that the same were both executed originally, in due form of law.

Bryan Mullanphy, the son of the deceased, was offered to prove that the copy produced and copied into this record, was a copy of the will and codicil aforesaid, who says, that the annexed paper to his deposition purporting to be a copy of an instrument of writing, purporting to be the last will and testament and codicil thereto, of John Mullanphy, deceased, now here presented to the said deponent, was copied by him, from the paper thus purporting to be the last will and testament and codicil of said John Mullanphy; and which he believes to be a true copy, and that the names of said John Mullanphy, which were affixed to the said instruments of writing, were the proper hand writing and signature of said Mullanphy, to the best of his knowledge, remembrance and belief, that said copy was made by him aforesaid, on the second or third days after the death of his father; and that the last time he saw said will and codicil, they were in the mansion house of his father. The testimony of said Mullanphy was objected to by Graham and others, on the ground that he was interested in establishing the will, he being a devisee therein named; but this objection was overruled by the county court. There is on the record, a great deal of other testimony going to shew, that at the death of Mullanphy, a will and codicil existed.—

Whether a witness, who is both devisee and heir at law, is competent to establish a will, depends on the question whether he will take more or less by the will than by the intestacy--see ante. p. 341.

But I have only stated so much as will be sufficient to shew the force of the points made on both sides. The point, whether B. Mullanphy is competent or not, perhaps, cannot properly be made on the appeal as it now stands, but as the parties have made an agreement to have the point decided, if the court will take it up, we are disposed to prevent the necessity of another appeal to do so.

When this cause was before this court, on a former

occasion, it was decided that the fact, that a witness was devisee, and heir at law also, did not disqualify such person from giving testimony, but that his competency depended on the question,—whether, by the establishment of the will, his share would be more or less than it would be if such will were not established?—See Missouri R. 341, 3d semi-annual part for 1836. In that case, the court thought the county court ought to hear the evidence as to the fact, whether, by the establishment of the will, his interest would be greater than it would be as heir at law, if the will were not established? The court did hear the evidence, and admitted the witness to testify. To ascertain whether that opinion was correct or not, we must look into the testimony the court had before it on the occasion. Mr. Clemens, whose wife is one of the heirs, says, that at present prices of real property, (that is, 1836,) the real estate of John Mullanphy, deceased, is in his opinion, worth three millions of dollars; but he says this estimate is founded upon a slight investigation of the matter. Mr. Graham, another son-in-law, says, that by a rough calculation, he should say the estate is worth $1,500,000. There appears to be seven children and a widow. If we take the difference between the two witnesses as the value of her estate, when Bryan Mullanphy gave his testimony, it will make the sum of two millions two hundred and fifty thousand dollars.— The widow would be entitled as the law then stood, to dower of one third, for life. What that third would be worth *in presenti*, I do not know, but from the circumstances, that when Mullanphy made his will in 1830, he said he was old, and from the fact that it appears on the record, that many of the children are married, I conclude that the widow must be largely advanced in life, as well as the deceased; I conclude that her life estate is not more than two hundred and fifty thousand dollars, and perhaps not near that much. Take this sum however, from the whole, and there will still remain two millions to be divided among seven heirs, which would leave to the share of each, two hundred and eighty-five thousand dollars, with a fraction.

The witness has devised to him, property by the will, in the opinion of Mr. Graham, worth from $40,000 to $50,000; he has also, by the 11th article of the will, devised two eighths, after deducting some fifteen thousand for specific legacies. Now two eighths of two millions as before, will give us the sum of five hundred thousand dollars—a sum considerably larger than he would be en-

*Margin notes:*

JUNE TERM 1837.

Graham & others *v.* O'Fallon, ex'r of Mullanphy.

Hence, where the real estate is proved to be worth about $2,250,000, and the share of witness, in case of intestacy, about $285,000, whilst under the will he gets only $50,000, and a remote contingent interest in an undivided share of the balance which in no event would equal his share, in case of intestacy; the interest of the witness is clearly *against* the establishment of the will, and he is a competent witness

JUNE TERM
1837.

Graham & others
v.
O'Fallon, ex'r of
Mullanphy.

titled to, in case of intestacy. But his testimony goes as much to establish the codicil as the will; and by the codicil, the 11th article of the will is revoked, and the two eighths thereby given to the witness, are given to *blank* Trustees. This codicil places the witness on the devise of land alone, which is proved to be worth from $40,000 to $50,000;—so that we must perceive, as I think, that by the proof of the will and codicil, the witness's interest is greatly diminished—so that, when he testifies to their support, he testifies against his interest, and is therefore competent. It has been said in argument, that the two eighths going into the general mass, will or may change the condition of the witness. I do not understand how it can change his condition, so as to make it his interest to establish the will, as I understand, the general mass is devised to Trustees, or rather as the clause stands, is devised to blanks, to be disposed of according to special directions; none of which, are calculated to enlarge the witness' share any thing like it would be in case of intestacy. Now, if the clause devising the general mass in blanks should be a total failure, the consequence, perhaps, would only be intestacy as to so much. Then, as there are many legacies and devises yet good, to be deducted from the general mass, the will and codicil will still give less to the witness than intestacy would do.— I am well satisfied the witness is competent, and if it were doubtful, the modern practice is to let the objection go to the credit.

The next inquiry is, is the original will and codicil sufficiently proved? The principal objections made by Messrs. Allen and Geyer are, that as it appears by the testimony of Mr. Spalding, that when he read the will to the testator, and handed it to him, it contained several blanks, some of which were found to be filled up in the hand writing of the testator, after his death. It must be presumed he filled them up after the execution, and before his death; and if this is so, then the will as executed, is not that found in his mansion house after his death.

Inasmuch as there is no evidence when these blanks were filled, and as it might have been done before the testator signed and declared it to be his will, I think the law will presume it was so done. The witness Spalding says, he does not know whether the testator took the will away with him or not, but the witness says that the testator went away, and brought back with him witnesses; but whether this was done the same day or some other day, he does not know. When testimony is thus uncer-

The witness whose evidence established the contents of the will also stated, that the last time he read the same before it was executed, there were several blanks.— Which blanks, it was also proved, were found after the death of the testator, to be filled up in testator's hand-writing;—it being *possible*, from the evidence that the blanks were filled either before or after execution. It was held that the presumption of law

'tainas to the time when the blanks were filled, and some of them were found filled in his own hand writing immediately after his death, I do presume in favor of the right time to make the instrument good. I think the testimony is also satisfactory, that the copy produced is a copy of the will and codicil proved to have had legal existence at, and upon the death of the testator.

The only remaining point is, whether one witness is not by law, sufficient to establish the contents of a lost will? I am not aware that there are any but two cases at common law, where more than one witness is required to establish a fact. The one is, in case of treason, and the other in chancery, where the defendant denies by his answer on oath, the matter of the bill, two witnesses are required to overturn the answer. We know that, although by the English statute of Wills, three witnesses are required to attest a will, that when it is so attested by three, any one of them is sufficient to prove that the others did attest in the testator's presence, and that the testator signed and executed the same—was of sound and disposing mind, &c. Our statute of Wills requires two witnesses to attest the will. Now, if this be done, is it not the law, that either of these will be sufficient to prove all the other facts required by law to exist?—I think it is. How does it happen then, to be supposed by counsel, that the contents of a lost will must be proved by two witnesses? It is because it is said to be the rule by the civil law in the ecclesiastical courts of England, and because this court in the case of Graham et al. vs. O'Fallon, 3d vol. Mo. R. 511, have cited the rule, as found in Toller, page 71. But the counsel are greatly mistaken, when they suppose the court meant to decide that two witnesses were absolutely necessary to establish the contents of a lost will. It will be seen that the question was not then before the court, how many witnesses are necessary to establish the contents of a lost will? but the question was, can a will, destroyed or lost, be set up at all by proving the contents?' This power of the court to set up by parol proof of the contents of a lost deed, a will, or even a record, is in my opinion, a common law power, not depending on civil law rules, (except in civil law courts;)—see page 510, 3d vol. Mo. Decisions, same case. The case in Toller never was cited by this court, to prove two witnesses were necessary to prove the contents of a lost will, nor does the author even affirm the law was so, but it had been done.

The evidence in the case before us rests on the rules of

*[margin notes:]*

JUNE TERM 1837.

Graham & others v. O'Fallon, ex'r of Mullanphy.

will be in favor of the *right time to* *make the instrument good;* to wit: that the blanks were filled before the will was signed and attested.

*One* witness is sufficient to establish the contents of a lost will.

·JUNE TERM
1837.

evidence at common law, and by that law, one witness is enough.

I am of opinion that the will is sufficiently proved, and the decree of the circuit court is affirmed. That this cause is remanded to that court, to proceed in the same according to law.

TOMPKINS, Judge. I concur in the above opinion.