MARY BELLE WRIGHT, Respondent, v. ADA WRIGHT MCDONALD, ALBIRTIE JEAN WRIGHT, VIRGINIA WRIGHT WIEMANN, WILLA JUANITA WRIGHT, JOHN LESLIE WRIGHT, JO ANN WRIGHT, Appellants, LOTTIE ITSCHNER, BEULAH HANKINS, MARY J. OWNBEY, THE FIRST BAPTIST CHURCH OF MACON, MISSOURI, the Trustees of the First Baptist Church of Macon, Missouri, who are B. R. WILLIAMS, R. A. WALLER, R. WILSON BARROW, PAUL L. JONES, and ALBERT SKINNER, Defendants, No. 41513—233 S. W. (2d) 19.

Court en Banc, October 9, 1950.

(1)

R. *Wilson Barrow, James Glenn, James P. Boyd* and *B. Jay Knight* for appellants.

4

*Waldo Edwards, William M. Van Cleve* and *Olliver Nolen* for respondent.

[20] BOHLING, C.—Mary Belle Wright brought this action to establish a propounded lost and destroyed will of Albirtie J. Wright, her daughter. She named as defendants the beneficiaries, other than herself, of said alleged will and the heirs at law of said deceased. The proceeding involves the title to real estate and an estate of ap-, proximately $50,000. Probate of the tendered instrument was rejected by the Probate Court of Macon county, Missouri. Thereafter, the paper writing was established as the will of Albirtie J. Wright, deceased, by a verdict signed by nine jurors in Monroe county, a change of venue having been taken from Macon county. Certain heirs at law of Albirtie J. Wright prosecute this appeal claiming plaintiff did not make a submissible case; that incompetent and prejudicial evidence was admitted, and that specified instructions were erroneous.

Mary Belle Wright, plaintiff, and her husband, J. A. Wright, were the parents of five children, to wit: Albirtie J. (also [21] known as Birtie), Willa, Addie (known in the record as Ada), Pringle, and Mary J. (known in the record as May). J. A. Wright died in 1927 or 1928. Willa, who married a Mr. Nicodemus, died in October, 1945, without descendants. Pringle died in August, 1944, and left the following children: Albirtie Jean Wright (named for deceased), Virginia Wright Wiemann, Willa Juanita Wright, John Leslie Wright, and Jo Ann Wright. Ada is now Ada Wright McDonald of Rockford, Illinois; and May is now May Wright Ownbey.

Albirtie J. Wright died Saturday night, March 17, 1946, being about sixty-five years of age, leaving her mother, Mary Belle Wright, her sisters Ada and May, and the children of her deceased brother Pringle surviving as her heirs at law.

Miss Wright served as Clerk for Probate Judge Milton A. Romjue and later as his secretary when he was elected to Congress. She attended a law school, was admitted to the Bar, was elected Probate Judge of Macon county, serving for eight years, and then engaged in the practice of law in Macon, Missouri, until her death. She was described as "intelligent," "capable," "particular," "precise," and "frugal." No issue exists respecting her testamentary capacity.

There was testimony that Albirtie Wright was fond of Mrs. Beulah Hankins and Mrs. Lottie Itschner.

Plaintiff was eighty-seven years old at the time of the trial, March, 1948. She and Albirtie had lived together many years. She testified

that about two or three weeks prior to Albirtie's death Albirtie read her (Albirtie's) will to plaintiff and she (plaintiff) read it "about three times I think"; and that Albirtie had the will in a pocketbook in a shoebox in plaintiff's closet on the night Albirtie died.

According to plaintiff, Albirtie came home tired Friday night and plaintiff persuaded her not to return to work that night. Albirtie remained home Saturday. During the afternoon, at Albirtie's request, May Ownbey, who lived nearby, prepared some chocolate pudding and Albirtie ate two dishes of the pudding. Albirtie retired before 6:00 p. m. After finishing the evening dishes, plaintiff thought Albirtie looked bad and, although a telephone was in the house, she went next door and personally asked a neighbor to go after someone. After May arrived, Dr. Groneway was called and he gave Albirtie some medicine. Plaintiff retired before 9:00 p. m. Later, May awakened plaintiff and stated she thought Albirtie was dead. Unable to get Dr. Groneway, Dr. Lloyd J. Carroll was called. He had his wife accompany him and upon arrival shortly after 1:45 a. m. found Miss Wright dead, and was of opinion she had been dead for about an hour.

Plaintiff testified that she saw Albirtie's will that night; that May was reading it to her husband (Charles), and Dr. and Mrs. Carroll (denied by Dr. Carroll and Charles Ownbey); that later that morning she could not find Albirtie's will or diamonds; and that when she accused May of taking them all May said was "Oh! Mother."

There was also evidence that plaintiff and May, at plaintiff's suggestion, put Albirtie's diamonds in a salt jar and hid the jar for safekeeping. Plaintiff forgot the diamonds but admitted that they were delivered to her soon after she left May's home.

Plaintiff gave testimony to the effect the three sisters were not too friendly; and also to the effect they were on good terms, particularly Albirtie and Ada.

After Albirtie's death, plaintiff made her home with May and Charles Ownbey until September 9, 1946. She testified that about three weeks prior to leaving she went into the kitchen one morning and May asked her what Albirtie's will provided; that she told her; that May said: "Here is Birtie's will"; that plaintiff asked where she had found it; that May replied it had been in the locker; and then "Charlie mauled May," grabbed the will and, getting some matches, went out, and that was the last time she saw the will. This occurrence is denied by Charles Ownbey.

Plaintiff testified that the first person she told about Albirtie having a will was Lottie Itschner and placed the time as being after she went to live with Lottie, which according [22] to disinterested witnesses was about six months after Albirtie's death, although plaintiff thought it was only two months.

Plaintiff testified respecting the contents of the will that Albirtie wanted her debts paid; that she wanted the Baptist Church to have $500; that she wanted Albirtie Jean to have $100 and the other four children of Pringle Wright to have $5 each; that at the date of the propounded will Ada and May, Albirtie's sisters, were the only living children of plaintiff and they were to have $1 each; "and the rest of it was all to me," but, after some questioning, she wanted it to go equally to Lottie Itschner and Beulah Hankins after plaintiff's death: " * * * she wanted me to have everything anybody could want if it took it all, and what was left to be Lottie's and Beulah's." Lottie and Beulah were to see that some woman stayed with plaintiff. Lottie Itschner was to be executrix and to serve without giving bond. The propounded will, Exhibit A-1, bears date of "this —— day of ——, 1946."

The case was presented on the theory that being a beneficiary under the will plaintiff was not a competent witness to prove its due execution. Consult Trotters v. Winchester, 1 Mo. 413; Miltenberger v. Miltenberger, 78 Mo. 27, 31; Mann v. Balfour, 187 Mo. 290, 303, 86 S. W. 103, 106(1). Expressly stating counsel was not asking for signatures, just the names to identify the propounded will, and also not for the purpose of proving its due execution, plaintiff was permitted to testify that Albirtie's name and the names of Dr. and Mrs. Carroll were on it.

Unsuccessful efforts were made to find Albirtie J. Wright's will at the home and her office.

A beneficiary is competent to establish the contents of a lost will. Mann v. Balfour, 187 Mo. 290, 303(I), 86 S. W. 105, 106(1). Notwithstanding discrepancies in plaintiff's testimony and that much could be presented to a jury to discredit her, her testimony, if believed, established that her daughter Albirtie had a will and its contents to the extent above set forth. Neal v. Caldwell, 326 Mo. 1146, 34 S. W. 2d 104, 107[2 et seq.]; Harrell v. Harrell, 284 Mo. 218, 223 S. W. 919, 922[2]. Consult Dickey v. Malechi, 6 Mo. 177, 184, 34 Am. Dec. 130. Plaintiff's testimony also established, if believed, that the propounded will was in existence after the death of Miss Wright, and, consequently, had not been destroyed by testatrix with any intention of revoking it.

May the instrument established by plaintiff's testimony be probated as the last will and testament of Albirtie J. Wright, deceased? Its probate may be contested on any of the recognized grounds, and its due execution is here questioned.

Plaintiff relies upon the testimony of Dr. and Mrs. Lloyd J. Carroll to establish the due execution of the propounded will. They were subject to cross-examination by all parties.

Dr. Carroll, an osteopathic physician and surgeon, and his wife, Kathryn, had an office and residence on the same floor of the Penney

building (owned by Miss Wright) as Miss Wright's law office. They, always acting as witnesses together, witnessed four to six wills at the request of Miss Wright. They testified that always four persons were present—Miss Wright, Dr. and Mrs. Carroll, and one other person.

The last will they witnessed at Miss Wright's request was in October, 1945, according to Dr. Carroll, and sometime between the middle of October and Christmas, 1945, according to Mrs. Carroll. Each testified that on this occasion Miss Wright asked them to her office to witness a client's will; that, upon arrival in her office, they were introduced to a lady by Miss Wright, who told them it was this lady's will. They did not recall her name, and never saw her before or since, but Dr. Carroll described her. When introduced, this lady said: "How-do-you-do" and "pleased to meet you"; and, upon their leaving right after signing, the lady said: "Thank you." The lady remained in Miss Wright's office.

The instrument was ready for signatures. Neither Dr. nor Mrs. Carroll read the will or the attestation clause, and it was not read to them. They stated the attestation [23] clause looked similar to others. Since then they have informed themselves on the wording of wills and attestation clauses. Dr. Carroll stated he signed first, his wife second, and the other lady next but, "to be real honest about it, I don't know"; that there was no signature on it when he signed; and that Miss Wright did not ask the other lady to witness her, Miss Wright's, will. Mrs. Carroll thought the other lady signed first, and then she and her husband signed. They, the three, signed below the attestation clause. They testified that Miss Wright, who had remained seated, then reached for the paper, put it in front of her and signed it above the attestation clause.

We quote the following excerpts from Dr. Carroll's testimony:

"Q. Did ** Albirtie Wright ever tell you or request you to sign a will for her, her will? A. No, at no time."

"Q. Whose will were you requested to sign there by Albirtie Wright? A. The lady's whom we were introduced to in the office."

"Q. But there was no request made of you by Miss Wright to sign her will? A. No.

"Q. No declaration to you that that was her will? A. At no time.

"Q. But on the other hand there was a declaration by her that it was her client's will? A. That's right."

"Q. * * * At the time that you signed this paper writing, and before you signed it, and after the time you signed it, while you were in that room, not after you left the room but while you were there, I want to ask you if Albirtie Wright even said anything, did anything by act or deed, or by word, to lead you to know, or even believe that the paper writing you signed that day was her will? A. No, she did not at any time."

"Q. Did she say anything at any time while you were in the office and before or after you signed that, about that being her will, Albirtie Wright's? A. No, sir; no, sir. * * *

"Q. State this, whether or not at the time you signed that paper writing you had any idea, or had any knowledge, or had any information that it was the will of Albirtie Wright? A. I did not."

"Q. Doctor, were you made to understand at the time that that will was signed, that you were witnessing the will of that lady [the lady they met in Miss Wright's office]? A. Absolutely."

He testified that numerous persons talked to him after this controversy arose and some insisted he had witnessed Miss Wright's will, and he told some of them that if he did witness Miss Wright's will it was under the circumstances hereinbefore set forth; and that he had always put that condition or rider on it. "I told Mr. Fower and I have told others that if we signed Albirtie Wright's will, we done it under those conditions only, first, last, and all the time, all down through and there is no other way to tell it."

Mrs. Carroll's testimony was to like effect. We quote:

"Q. Don't you remember she [Miss Wright] said: 'Mrs. Carroll, come up and witness my will,' isn't that what she said to you? A. No, she didn't say anything about her will. * * * She mentioned about a client, she said she had a client in her office who was making out a will and she wanted us to come and sign it."

"Q. Well, at the time that you signed that paper writing, did you know or believe you were signing Miss Albirtie Wight's will? A. No, I didn't know it, and I didn't think it, and I didn't believe it.

"Q. Whose will did you think you were signing? A. This Mrs. So-and-so that was sitting over here."

Much additional testimony to like effect was given by Dr. and Mrs. Carroll.

Missouri statutes require: "Every will shall be in writing, signed by the testator * * * ; and shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator." § 520, R. S. 1939, Mo. R. S. A.

Compliance with these provisions have been held mandatory. Ray v. Walker, 293 Mo. 447, 240 S. W. 187, 191[1]; Avaro v. Avaro, 235 Mo. 424, 429(1st), 138 S. W. 500, 501[1]. The purpose is to prevent [24] fraud and uncertainty in the transfer of property by testament in lieu of its devolution to the heirs at law.

Plaintiff had the burden. In Neal v. Caldwell, 326 Mo. 1146, 34 S. W. 2d 104, 107[3-6], the lost will was considered proved by "clear and convincing" evidence. Consult 68 C. J. 1031, § 820; 57 Am. Jur. 639, § 983; 7 Wigmore, Evidence, 509, § 2106; Annotation, 126 A. L. R. 1141.

In holding a person cannot discharge the duties of a witness to a will when not requested to do so by the testator, and when, at the time of its execution, he did not intend or have in mind to sign as a witness, Baxter v. Bank of Belle, 340 Mo. 952, 104 S. W. 2d 265, 268[2], concludes: "There may be authority that a person can be considered to have witnessed the execution of a will, even though not requested and even though the person did not at the time have in mind that he was acting as such, but it seems to us that such a rule destroys the very purpose of the statute."

"Every will·shall be in writing, signed by the testator  *  *  *  ; and shall be attested by two  *  *  *  competent witnesses subscribing their names  *  *  *  " (§ 520, supra) connotes something more than the mere attestation of an act or the genuineness of a signature, and, under its wording, embraces the attestation that the writing is the will of the testator. As considered in Baxter v. Bank of Belle, supra, and cases there cited, the attesting witnesses must have the requisite animus attestandi—must know at the time that they are attesting testator's will. Walton v. Kendrick, 122 Mo. 504, 525, 27 S. W. 872, 877, citing earlier Missouri cases; Cone v. Donovan, 275 Mo. 557, 204 S. W. 1073[1]; Odenwaelder v. Schorr, 8 Mo. App. 458, 467.

The trial theory was that Miss Wright published the instrument to the attesting witnesses as ·her last will and testament. Plaintiff's instructions required findings to that effect. Bingaman v. Hannah, 270 Mo. 611, 194 S. W. 276, 280[3, 4]; Look v. French, 346 Mo. 972, 144 S. W. 2d 128, 133[15, 16].

That Albirtie Wright published the instrument as her last will and requested the attesting witnesses to sign it as such rests in speculation and conjecture under the evidence having probàtive value. Dr. and Mrs. Carroll's testimony established that the will was published as the will of the lady they met in Miss Wright's office and that they attested it as that lady's will, and that they never acted as attesting witnesses to any will of Albirtie Wright. If the lady in Miss Wright's office signed below the attestation clause and Miss Wright signed above it, the instrument would still be the lady's ·and not Miss Wright's will if in fact it was the lady's will. 68 C. J. ·667, § 304; 57 Am. Jur. 216, § 276. There is no evidence of record to show that it was not the lady's will. If the attesting witnesses were attesting the will of the lady in Miss Wright's office, then, not having been asked to attest Miss Wright's will their attestation would not give it force and effect. Baxter v. Bank of Belle; Walton v. Kendrick; ·Cone v. Donovan; Odenwaelder v. Schorr, all supra. The propounded will bears date of "this —— day of ——, 1946," whereas the will attested by the Carrolls was executed between October and Christmas, 1945. This is not a case of the attesting witnesses being forgetful. Their statements are positive. There is

no substantive evidence that the Carrolls unknowingly attested Miss Wright's will instead of the lady's will. We have no substantive evidence establishing an attestation clause to a will of Albirtie Wright or other substantive evidence upon which to base a finding that the attesting witnesses are mistaken as was the case in plaintiff's authorities. German Evangelical B. Church v. Reith, 327 Mo. 1098, 39 S. W. 2d 1057; 76 A. L. R. 604; Morrow v. Board of Trustees of Park College, 353 Mo. 21, 181 S. W. 2d 945; Charles v. Charles, 313 Mo. 256, 281 S. W. 417; McClellan v. Owens, 335 Mo. 884, 74 S. W. 2d 570, and other cases.

Appellants also say that since all the testimony established that Albirtie Wright was the last person to sign the alleged will, there was no signature or will to be attested [25] at the time the attesting witnesses signed. The authorities reach different conclusions on this issue. Annotations, 39 A. L. R. 933, 57 A. L. R. 833; 57 Am. Jur. 249, § 337. We think the issue should await a case wherein its ruling is essential to a decision, as under certain circumstances a presumption may arise as to the due execution of the instrument. Consult German Evangelical B. Church v. Reith, 327 Mo. 1098, 39 S. W. 2d 1057.

Plaintiff may be able to establish the due execution of the will upon a retrial and the judgment should not be reversed outright.

We mention briefly some complaints respecting the evidence and instructions.

Extra-judicial statements admittedly made by witnesses and hearsay testimony tending to impeach their testimony under oath are competent. However, such testimony does not supply omissions in the evidence essential to a submissible case. See Re Moore's Will, 96 N. Y. S. 729, 733, 109 App. Div. 762, affirmed 187 N. Y. 573, 80 N. E. 1114.

Prior to plaintiff taking the stand to establish the contents of the propounded will, George N. Davis, an attorney, was permitted, over objections interposed on behalf of defendants, to identify the propounded will and the propounded attestation clause, Exhibit A-1; and to testify that it had been prepared by him, and that said exhibit was as exact a copy as he could make from the information given him by plaintiff of the contents of Albirtie Wright's will. The exhibit was read to the jury after plaintiff testified. Mr. Davis' testimony that said exhibit was as exact a copy of Miss Wright's will as he could make from the statements to him by plaintiff tended to bolster her testimony and was hearsay as to the contents of said exhibit and should have been excluded. Whether the exhibit constituted, when offered in evidence, a substantial copy of the propounded will was for the court in the first instance. The copy of the lost will admitted in evidence in Neal v. Caldwell, 326 Mo. 1146, 34 S. W. 2d 104, was prepared and established as a substantial copy by one

14

having testimonial qualifications of the contents of the original. Consult Scrivner v. American C. & F. Co., 330 Mo. 408, 50 S. W. 2d 1001, 1009 [13 et seq.]; Wigmore, Evidence, 3rd Ed., § 1278; 20 Am. Jur. 403, §§ 455, 910.

We think instruction P-1 could be more specific in the requirement of a finding of the publication of the instrument as the last will and testament of Miss Wright. Other instructions of plaintiff are more specific.

Instruction P-2 treats of a will which is not attested by the witnesses in the presence of each other and a will signed by the testatrix out of the presence of the attesting witnesses. Complaint is made that since the testatrix and the attesting witnesses all signed in the presence of each other the instruction was unnecessary and tended to broaden the issues. The instruction is not within the evidence adduced and should have been omitted.

We think instruction P-4 sufficiently calls for the publication of the instrument as testatrix's will in the presence of the attesting witnesses, although perhaps the instruction might be more aptly worded.

Instruction P-5 is attacked as being repetitious. Mere repetition in instructions is ordinarily not ground for reversal and the trial court is privileged to exercise a sound discretion in the matter. Mueller v. Schien, 352 Mo. 180, 176 S. W. 2d 449, 454 [18-20]; Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S. W. 2d 140, 146 [15-18]; Corley v. Kroger Grocery & Bkg. Co., 355 Mo. 4, 193 S. W. 2d 897, 900 [8, 9]; Raymond, Missouri Instructions, § 213.

The judgment is reversed and the cause is remanded.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the Court en Banc. All concur.