JESSIE CAPPS, LYDIA WISE, RUTH DRUMMOND, EUNA MEACHAM and ELVA SCOTT, Respondents, v. WALTER ADAMSON, DR. G. V. ADAMSON and EDNA BRADBURY, Appellants, v. JESSIE CAPPS, Administratrix, BEN CAPPS, ELBERT DRUMMOND and GEORGE ADAMSON, JR., Third-Party Defendants, No. 42237—242 S. W. (2d) 556.

Division One, September 10, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, October 8, 1951.

540

*Elliott & Russell* and *A. E. Elliott* for appellants.

*Luther W. Adamson* for appellant Edna Bradbury.

*Boyd Ewing, Robert L. Ewing* and *Douglas G. Hudson* for respondents; *Ewing, Ewing & Ewing* and *Hudson & Hudson* of counsel.

542

VAN OSDOL, C.—In this case title to described lands in Vernon County, Missouri, devolves upon the determination of the issue of an alleged revocation of a will, and upon the determination of the issues of adoption pursuant to an alleged oral contract, and equitable adoption by estoppel. The action was instituted by plaintiffs, the sisters of Dr. Adam H. Adamson, and a niece, the latter being the daughter of a deceased sister of Dr. Adamson. Dr. Adamson, a widower, died October 21, 1947, a resident of Arcadia, Crawford County, Kansas. He had been ▮▮▮ a successful physician, and died seised of lands in Vernon County, Missouri, and in Crawford County, Kansas, and possessed of a substantial personal estate consisting of cash and bonds.

Plaintiffs prayed for a judgment that a purported will of Dr. Adamson, dated May 26, 1942, "is not the last will and testament" of the deceased, and that he died intestate. It is plaintiffs' theory the will of May 26th was revoked by a subsequent will made by Dr. Adamson on July 31, 1942. In the will of May 26th the defendants, Walter Adamson and George Vest (Dr. G. V.) Adamson, were named as the devisees of the described tract of land situate in Vernon County,

Missouri. These two defendants and plaintiffs are the surviving heirs "of the blood" of Dr. Adamson.

The defendant, Edna Bradbury (born Edna Willetts), was joined as a party defendant, it being alleged by plaintiffs that defendant Edna Bradbury claimed some interest in the described lands.

In 1912 Dr. Adamson had married Mrs. Alice Mae Willetts, the mother of Edna Willetts. Mrs. Willetts had divorced her former husband, Willetts, father of Edna. Edna, attaining young womanhood, was married to James Fredrick (Fred) Bradbury. Mrs. Alice Mae Willetts Adamson, mother of Edna, died January 7, 1940. No children had been born of Alice's marriage to Dr. Adamson.

By answer and counterclaim, defendant Edna Bradbury stated her claim as an adopted daughter of Dr. Adamson on the theories of an oral contract fully performed, and equitable adoption by estoppel.

[The defendant Edna Bradbury also asked for the affirmative relief (against plaintiff Jessie Capps and her husband, third-party defendant Ben Capps; against plaintiff Ruth Drummond and her husband, third-party defendant Elbert Drummond; and against the third-party defendant George Adamson, Jr.) of the cancellation of deeds dated October 16, 1947, signed and acknowledged by Dr. Adamson, and describing lands in Vernon County, Missouri. The cancellation of these instruments was sought on the ground of want of delivery in the lifetime of the grantor. The grantees named in these conveyances (parties plaintiff and third-party defendant, as stated, to the instant action) stipulated that the judgment to be rendered in the instant case should cancel these conveyances. Dr. Adamson had also signed and acknowledged deeds dated January 17, 1940, describing lands in Kansas, in which conveyances defendant Edna Bradbury was grantee; and Dr. Adamson, October 16, 1947, also signed and acknowledged deeds describing the same Kansas lands to plaintiff herein, Lydia Wise, and husband for life, remainder to a nephew. These several conveyances of Kansas lands dated January 17, 1940 and October 16, 1947 and, we infer, another conveyance or other conveyances of Kansas lands dated October 16, 1947 to Euna Meacham, plaintiff herein, have been cancelled by the courts of Kansas. Bradbury v. Wise, 167 Kan. 737, 208 P. 2d 209.]

The trial chancellor found the issues of the counterclaim for adoption in favor of plaintiffs and against the defendant Edna Bradbury. And upon the separate trial of the issues of the revocation of the will of May 26th, a jury found the will was not the last will and testament of Dr. Adamson. Defendants have appealed from the ensuing judgment. Defendants-appellants, Walter and George Vest Adamson, insist the evidence was insufficient to justify the submission of the issue of revocation of the will of May 26th to the jury. Defendant-appellant Edna Bradbury insists that under the law and the

evidence the trial chancellor's findings and judgment denying her claim for adoption was erroneous.

Of the Claim of Adoption—

In the years of 1911 and 1912, Mrs. Alice Mae Willetts operated a rooming and boarding house in Kansas City. The mother of Mrs. Willetts made her home at the rooming and boarding house, as did Erma Talbott, niece of Mrs. Willetts. At this time defendant Edna Willetts was a child of eight or nine years. In the fall of 1911, Adam H. Adamson and his brother George Vest Adamson came to Kansas City to complete their education. Adam attended a medical college, and George was studying veterinary surgery. They roomed and boarded with Mrs. Willetts. A romance developed, culminating in the marriage of Adam and Mrs. Willetts January 29, 1912. In 1917, Adam ("Doctor" Adamson since 1913), his wife Alice, and the child Edna moved to Arcadia, Kansas. The wife Alice kept house and assisted the doctor in his practice by helping in the office, answering telephone calls and performing other tasks when needed. Edna had graduated from the elementary schools of Kansas City, and she attended and graduated from the high school of Arcadia. As stated, Edna married Fred Bradbury. Fred learned two years after the marriage that Edna was not born of the marriage of Dr. Adamson and Alice.

After his wife's death, in 1940, Dr. Adamson signed and acknowledged deeds describing lands in Kansas to the defendant Edna Bradbury. We infer these are the instruments, dated January 17, 1940, alluded to in the bracketed parenthetical paragraph, supra. The deeds stated the consideration—"Love and affection" and one dollar. The doctor also changed his bank account to a joint account with Edna; and he changed the beneficiary of his insurance to "Edna Bradbury, Daughter of the Insured, if living, otherwise to James Fredrick Bradbury, Son-in-law of the Insured." After his wife's death and for about five years, Dr. Adamson lived in quarters at his office. In 1945 or 1946, defendant Edna and her husband moved back to Arcadia from Kansas City, and a house was renovated or repaired for Dr. Adamson next door to the Bradburys' in Arcadia. Edna did the doctor's housekeeping; and the doctor dined with the Bradbury family, but shared the cost of the family food. At this time Dr. Adamson's health was failing; and, as stated, Dr. Adamson died October 21, 1947.

██ It is the rule that in order to establish an oral contract of adoption the claimant child has the burden of producing evidence so clear, cogent and convincing as to leave no reasonable doubt in the chancellor's mind. The same burden is upon one who asserts adoption by estoppel. Benjamin v. Cronan, 338 Mo. 1177, 93 S. W. 2d 975; Taylor v. Hamrick, Mo. Sup., 134 S. W. 2d 52; Westlake v. West-

lake, Mo. Sup., 201 S. W. 2d 964; Rich v. Baer, 361 Mo. 1048, 238 S. W. 2d 408.

██ In the instant case the claimant, defendant Edna Bradbury, relies upon a prenuptial oral contract said to have been entered into between Dr. Adamson and claimant's mother, Alice Mae Willetts, in which agreement Dr. Adamson had promised to adopt claimant. In supporting her claim of an oral contract to adopt, claimant Edna introduced the testimony of two witnesses—one, Belle French, who roomed and boarded at the Willetts home in the winter of 1911-1912; the other witness was Erma Talbott, who is the cousin of Edna Bradbury and who, as stated, was then living with her aunt Alice Mae Willetts.

Belle French testified that she could remember when Adam and George Vest Adamson came to the Willetts house to live. She heard a conversation between Adam and Alice before they were married. The witness testified, "Well, Doc told her (Alice) when they got married they was going to adopt, he would adopt the girl and the girl and her (Alice's) mother could have their home with him. - - - He said he would give her (Edna) his name and have a home for her as soon as they were married, he would adopt her."

Edna's cousin, Erma Talbott, testified that she heard conversations between the doctor and Alice before they were married. The witness was twelve years old at the time. The conversations related to Edna— "Edna's future welfare was discussed and Dr. Adamson promised to adopt Edna. - - - anything that was accumulated together would automatically be Edna's as a result of the adoption."

It is observed that the asserted conversations between Dr. Adamson and Alice were approximately thirty-eight years prior to the trial of the instant action in January 1950. Evidence resting alone on the memory of witnesses who attempt to recall conversations that occurred years ago is not considered of very great probative value, especially where resort must be had to the ██ conversations for ascertaining whether there was a contract and what the contract was. This is but the recognition of the fallibility of man's recollection of the actual language used in conversations of long ago. Russell v. Sharp, 192 Mo. 270, 91 S. W. 134; Wales v. Holden, 209 Mo. 552, 108 S. W. 89; Forrister v. Sullivan, 231 Mo. 345, 132 S. W. 722; Kidd v. St. Louis Union Trust Co., 335 Mo. 1029, 74 S. W. 2d 827; Steere v. Palmer, 359 Mo. 664, 223 S. W. 2d 391.

In this case, where the rule is that we must look at the evidence with an especial strictness (as is generally the rule where it is sought to use verbal evidence in lieu of a writing required by the Statute of Frauds), we hesitate to rely upon the testimony of conversations so anciently engaged in—the one witness, a roomer and boarder in the Willetts home (a casual friend of Alice and Adam), and the other, a child of tender years—to establish a contract of adoption, particu-

larly in view of the trial chancellor's contrary findings. The trial chancellor had the advantage of observing the witnesses and their demeanor. At this point we set out the evidence of an admission made by Edna at a time soon after the death of Dr. Adamson. A witness testified Edna then said "she wasn't an adopted daughter, that she was a stepdaughter of Dr. Adamson."

There was testimony that Dr. Adamson generally referred to Edna as his "daughter" or his "adopted daughter." There was also testimony that Dr. Adamson sometimes referred to Edna as his "stepdaughter" and as "the wife's daughter." However, after the marriage of her mother to Dr. Adamson, Edna invariably went by the name of "Adamson." Dr. Adamson caused her name to be enrolled as "Edna M. Adamson" at the public schools. She was graduated from ward and high schools as "Edna M. Adamson"; she attended Sunday School as "Edna Adamson." She was married as "Edna M. Adamson"; a birth certificate of one of her children, signed by Dr. Adamson, certified the mother's name as "Edna May Adamson." Dr. Adamson referred to Edna's children as "his grandchildren." He was proud of Edna, and of her and her children's accomplishments. The apparent relationship between Dr. Adamson and Edna was that of father and daughter. He counseled and advised her; worried about her frail physical condition; and gave her the most careful medical attention when she was ill. He treated her quite as an own father would. These facts and circumstances are significant, but are not decisive (Rich v. Baer, supra; Holland v. Martin, 355 Mo. 767, 198 S. W. 2d 16) of the issue of an agreement to adopt in the instant case. While such facts and circumstances are in harmony and consistent with the relationship of father and daughter, such facts and circumstances are also in harmony and consistent with a stepfather-stepdaughter relationship. Kidd v. St. Louis Union Trust Co., supra. The fact that Dr. Adamson made application for the change of the beneficiary of his insurance to Edna Adamson, "daughter," is to be considered but is not determinative. Lamb v. Feehan, Mo. Sup., 276 S. W. 71; Taylor v. Hamrick, supra. We paraphrase and adopt the language of this court in the Kidd case (335 Mo. at page 1038, 74 S. W. 2d at page 830) in its application to the instant case as follows—absent any contract of adoption, Edna was Alice's daughter and continued to be such upon Alice's marriage to Dr. Adamson, upon which marriage Edna became Dr. Adamson's stepchild. He was morally, if not legally, obligated to give Edna a home, rear, support and educate her as his own child. In his future treatment of her she was practically his child, though in law only a stepchild, and in her eyes he became her father. It was natural for him, as the head of the family, to assume authority and control over her as a member of the family. It was not unusual and is of little significance that, as her mother upon marriage took Dr. Adamson's

name, Edna would also, and that he would call her his child and refer to and introduce her as such.

We have carefully considered Drake v. Drake, 328 Mo. 966, 43 S. W. 2d 556; Martin v. Martin, 250 Mo. 539, 157 S. W. 575; Remmers v. Remmers, Mo. Sup., 239 S. W. 509; Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885; and other cases upon which ▌ defendant-appellant Edna relies, and find them distinguishable upon the facts. In our case an agreement to adopt has not been established and there is no evidence of conduct of or benefit to Dr. Adamson growing out of the relationship which, in justice, equity and good conscience, should preclude the denial of Edna's adoption. No doubt Dr. Adamson had great pleasure in having the child Edna in his home. He was happy in his association with her and enjoyed her respect and affection. He evidently experienced the delights of a grandfather in the presence of Edna's children and her children's children, and, during the last months of his life, Dr. Adamson, in failing health, had the privilege of being near Edna and of enjoying her kindly service and the hospitality of the Bradbury home. But Edna was also the recipient of great benefit by virtue of her relationship with Dr. Adamson and as a member of his family. She received the care, the support, the affection, the counsel and the guidance a child enjoys as from an own father. Furthermore, the record shows Edna was the recipient of substantial material benefits upon Dr. Adamson's death. It seems she received cash, bonds and insurance in total sum of at least $20,000. The relationship and conduct of Dr. Adamson and Edna were mutually beneficial. We believe the evidence does not justify a finding of an adoption by estoppel. Rich v. Baer, supra; Westlake v. Westlake, supra.

▌ Of the Claim of Revocation of the Will of May 26th—

As stated the will of May 26, 1942, contained a devise of the described lands in Vernon County to defendants Walter and George Vest Adamson, brothers of Dr. Adamson. Assuming the will of May 26th was duly executed, was there sufficient evidence to warrant the submission to the jury of the issue of revocation of the will of May 26th by a subsequent will of July 31, 1942?

G. W. Corporon, an attorney who has practiced at Arcadia, Kansas, for thirty years, testified that at Dr. Adamson's request the witness drew a will on July 31, 1942. The will had an attestation clause. The will also contained a clause revoking the former will. October 16, 1947, the witness again saw the will, at which time he used the will to verify certain descriptions of lands and prepared deeds at Dr. Adamson's direction. These are the various instruments, dated October 16, 1947, to which we have alluded in the parenthetical paragraph, supra. The doctor said he intended to destroy the will of July 31st—"use deeds instead of the will." The witness recognized the will as the one he had drawn for the doctor July 31, 1942; and

when the witness last saw it, October 16, 1947, Dr. Adamson's signature had been affixed thereto in the appropriate place, and the attestation clause *bore the signatures of two witnesses*—''I do not remember who they were.'' The last time the witness saw the will (of July 31st) he handed it to the doctor. ''I said, 'now, if that is found in your papers if you should be killed on the highway it will be probated.' He said, 'I am going to destroy it.' '' The witness only remembered the contents of the will in a general way. It covered the doctor's farms; had the names of all of the doctor's brothers and sisters; and included the name of Edna Bradbury.

Fred Bradbury, husband of defendant Edna Bradbury, saw the will dated July 31st. He read it soon after it was made. Dr. Adamson showed the document to him. It was signed by the doctor and by two witnesses, ''Herschel Mooneyhan is the only one I can remember. - - - Edna Bradbury's name was in that will,'' and defendants Walter and George Vest Adamson were each to receive one dollar.

Herschel Mooneyhan had lived in Arcadia for about 35 years, and was well acquainted with Dr. Adamson. Mooneyhan testified that Dr. Adamson made a will, after the death of his wife, ''and I signed it as a witness.'' He could not recall ''who the other witness was - - - The will that I signed as a witness, he read it to me, but I can't tell you one word that was in it, that's been too long ago.''

Defendants-appellants, Walter and George Vest Adamson, contend there was no substantial evidence tending to show that Dr. Adamson signed the will of July 31st or that the instrument was attested by two or more competent witnesses subscribing their names thereto in the presence of Dr. Adamson (Section 468.150 R. S. 1949); and defendants-appellants contend a will may be revoked by a ''subsequent will, in writing'' as provided in Section 468.240 R. S. 1949, but only if the subsequent will is shown to have been duly executed as required by Section 468.150, supra. Defendants-appellants further say the instrument of July 31st was not shown to be inconsistent in its terms with the will of May 26th, and was consequently insufficient as a revocatory instrument.

It is true plaintiffs in relying upon the will of July 31st as a ''subsequent will, in writing'' revoking the will of May 26th had the burden of proving the subsequent will was executed in accordance with the statute, Section 468.150, supra; and that the subsequent will was revocatory of the former, either because the dispositive provisions of the subsequent will were so inconsistent with the dispositive provisions of the former will as to revoke it or because the subsequent will contained an express clause of revocation. West v. West, 144 Mo. 119, 46 S. W. 139; Vol. 1, Page on Wills, Lifetime Edition, § 457, pp. 817-820; Neibling v. Methodist Orphans' Home Assn., 315 Mo. 578, 286 S. W. 58; Vol. 1, Page on Wills, Lifetime Edition, § 463, pp. 831-834; 68 C. J., Wills, §§ 492 and 494, pp. 803-806.

The attorney and scrivener, Corporon, testified the will of July 31st contained a clause revoking the former will; and the witness Bradbury testified the will of July 31st bequeathed one dollar to each of the defendants, Walter and George Vest Adamson, whereas the evidence shows the will of May 26th devised to such defendants the described lands involved in the instant action. Assuming the will of July 31st was duly executed, the testimony of these witnesses was sufficient to support a conclusion the will of July 31st was a revocation of the will of May 26th. Secondary evidence is admissible to prove the contents of a lost or destroyed will; it is also held the contents of a will which has been lost or destroyed may be established by the testimony of a single witness. Neal v. Caldwell, 326 Mo. 1146, 34 S. W. 2d 104; Charles v. Charles, 313 Mo. 256, 281 S. W. 417; Dickey v. Malechi, 6 Mo. 177; Graham v. O'Fallon, 4 Mo. 601.

The legislature has provided that, in proving wills for probate, when one of the witnesses to a will shall be examined and the other witnesses are dead, insane or their residences unknown, then proof shall be taken of the handwriting of the testator and of the witnesses dead, insane or their residences unknown, "and of such other circumstances as would be sufficient to prove such will on a trial at common law." Section 468.510 R. S. 1949. In our case one of the subscribing witnesses, Mooneyhan, was examined, but the identity of the other (purported) subscribing witness was not and, it seems, could not be shown because unknown, at least unknown at the time of the trial. There are bases for the inference the will of July 31st was destroyed by Dr. Adamson with revocative intent. Anyhow, the inference is that the will of July 31st was either lost or destroyed. Obviously plaintiffs could not produce the second subscribing witness unknown to them, nor could the handwriting on the will of such unknown subscribing witness be directly proved, the will having been lost or destroyed.

In a case where a will had been lost or destroyed by a burglary of a safety deposit box so that the handwriting of neither of the supposed subscribing witnesses could be proved, and one of the supposed subscribing witnesses only thought he had witnessed the will, and the other was dead, yet the proof of the lost or destroyed will as a valid instrument duly executed did not fail, there being other "substantial" evidence—shown circumstances supporting the reasonable inference the will had been duly executed. The due execution of the will was necessarily proved by the best evidence procurable *in the peculiar situation*. Charles v. Charles, supra. See also Harrell v. Harrell, 284 Mo. 218, 223 S. W. 919; In re Rosencrantz's Estate, 191 Wis. 109, 210 N. W. 371.

As we have said, Corporon testified Dr. Adamson's signature had been appropriately affixed to the will of July 31, 1942, when, on October 16, 1947, Corporon saw the will; and the attestation clause

then bore "the *signatures* of two witnesses." Corporon does "not remember who they were." Fred Bradbury testified the will of July 31st was signed by the doctor and by two witnesses, but he can remember the identity of only one. Mooneyhan testified he signed a will of Dr. Adamson "as a witness," but he cannot recall who the other witness was. (Mooneyhan was not a witness to the will of May 26th.) Bradbury remembers the will of July 31st was signed by Mooneyhan. Here it would seem legitimate inferences could be drawn *from precisely what was said.* When the three witnesses, Corporon, Bradbury and Mooneyhan, all three of years of residence in Arcadia, testified they could not "remember" or could not "recall" who the witnesses were, or who the second subscribing witness was, they really said they cannot now (at the time of trial) call or bring to mind again that which they once perceived or knew. According to his testimony, Corporon, a lawyer of years of experience and residence in Arcadia, was engaged to prepare conveyances to be used by his client Dr. Adamson in lieu of the will of July 31st. He then had occasion to see and examine the will in effectuating his client's purpose. He saw the signatures of the purported witnesses. Now when Corporon, on October 16, 1947, saw the will of July 31st and observed the names purportedly subscribed as witnesses thereto, it is reasonable to say he must have seen that the will in fact bore the genuine signatures of two witnesses known to him to be competent, for he then recognized the will as a valid instrument duly executed, susceptible of probate, and, in effect, so admonished Dr. Adamson, to which admonition the doctor replied, "I am going to destroy it." Consequently, we now say Corporon, although he cannot now remember who the witnesses were, does remember and testified of a *circumstance, a fact —his own verbal act* at the time he saw the will and the signatures of the witnesses thereto. He testified he told Dr. Adamson that, in the event the doctor should be killed and the will were found, "it will be probated." It seems to us this circumstance supports a reasonable inference that the will in fact bore the genuine signatures of Mooneyhan whom Corporon had no doubt known for years, and of the other witness whose identity Corporon now is also unable to recall.

Giving full credence to the testimony of the three witnesses which testimony we have examined in the preceding paragraph, and indulging all reasonable inferences therefrom tending to show the due execution of the now lost or destroyed will of July 31st, we have come to the conclusions the testimony was the best evidence obtainable in the very peculiar situation, but yet is substantial in sustaining the trial court's submission of the issue of the revocation of the will of May 26th to the jury.

We bear in mind the provisions of Section 468.150, supra, requiring that a will shall be in writing signed by the testator and shall be attested by two or more competent witnesses "subscribing their names

to the will in the presence of the testator," are mandatory. Wright v. McDonald, 361 Mo. 1, 233 S. W. 2d 19; Potter v. Ritchardson, 360 Mo. 661, 230 S. W. 2d 672; German Evangelical Bethel Church of Concordia v. Reith, 327 Mo. 1098, 39 S. W. 2d 1057. There was evidence the will of July 31st had an attestation clause which bore the signatures of the two witnesses. However, even absent an attestation clause, if it be shown a will signed by a testator was subscribed by two or more competent witnesses, the subscription is a symbol of attestation and presumptive evidence of sufficiently inherent probative force to sustain a finding that the witnesses in fact subscribed their names in the testator's presence. German Evangelical Bethel Church of Concordia v. Reith, supra; Burkland v. Starry, 361 Mo. 348, 234 S. W. 2d 608.

The judgment should be affirmed.

It is so ordered. ▮ *Lozier* and *Coil, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.